# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| TIFFANY WILSON, as the administrator of the ESTATE of ABDUL SHARRIF WILSON, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | **AMENDED COMPLAINT AND JURY DEMAND** |
| THE CITY OF NEW YORK; PHILLIP GRIMALDI, in his individual capacity; JOHN DECARLO, in his individual capacity; PETER MCMAHON, in his individual capacity; ARTHUR WILLIAMS, in his individual capacity; ROBERT IZZO, in his individual capacity; EDWARD FEIT, in his individual capacity; LIEUTENANT JAMES LUONGO, in his individual capacity; RICKY BRADFORD, in his individual capacity; Police Officer MARCO VENEZIA, in his individual capacity; Dr. JONATHAN ARDEN, in his individual capacity; and OTHER AS-YET-UNKNOWN OFFICERS & SUPERVISORS 1–10 | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Case No. 15-cv-4156** |
| Defendants. | ) ) | |

_____ )

Plaintiff Tiffany Wilson, as the administrator of the Estate of Abdul Sharrif Wilson, by and through her attorneys, the law firms of Neufeld Scheck & Brustin, LLP, and Perlmutter & McGuinness, P.C., states as follows:

## INTRODUCTION

1.     Before he was exonerated by DNA evidence, Abdul Sharrif Wilson spent almost twenty-two years wrongly imprisoned for a brutal triple murder he did not commit. When he was first wrongly arrested for the crime, Sharrif was a particularly vulnerable subject of police attention: a fifteen-year-old African-American gay teenager who had yet to come out to his family. When he

1

was finally released from prison over two decades later, Sharrif suffered from a number of prison-induced health problems that led to his untimely death at age 38—less than a year after his release.

2.      This tragedy was no accident. Rather, this miscarriage of justice was the direct result of egregious misconduct by the NYPD detectives who investigated the Brooklyn murders at the center of Sharrif's case. Specifically, the detectives ignored the obvious drug angle to the June 18, 1992 murders of Annie Yarbough, her twelve-year-old daughter Chavonne Barnes, and Chavonne's best friend Latasha Knox. Instead, the NYPD detectives focused their investigation on Ms. Yarbough's openly gay eighteen-year-old son, Antonio ("Tony") Yarbough, and his fifteen-year-old friend, Sharrif.

3.      Although Defendants knew Sharrif had been up nearly twenty-four hours, they kept Shariff in the police station for hours on June 18, 1992, without sleep; although New York law required any questioning of a fifteen-year-old suspect be done only after detectives had notified a parent or guardian and that they follow special procedures for the questioning, Defendants falsely reported that Shariff had told them he was seventeen years old in order to question him alone. Three to four detectives interrogated Sharrif at a time. During the interrogation, at least one of the detectives repeatedly slapped Sharrif on his head, and the detectives repeatedly slammed their hands on the table. His interrogators demanded that Sharrif tell them that he and Tony—motivated by supposed conflict with Tony's mother over Tony's sexuality—had strangled, stabbed, and sexually molested the victims and then moved their bodies. Detectives falsely promised Sharrif that if he told them what they wanted to hear, he could finally go home. Eventually, through the tactics employed during the unrecorded interrogation, detectives coerced Sharrif into giving a false confession.

2

4.      Sharrif was actually innocent, and had no independent knowledge about the crime. But the detectives coerced and manipulated him into giving an oral and videotaped "confession" that falsely appeared both reliable and incriminating because it contained nonpublic facts about the crime that only the police and the true perpetrator could have known. These key nonpublic details included: (1) that all three victims had been both stabbed and strangled; (2) that the strangulation had been by electrical cords; (3) that these electrical cords had been cut from appliances in the apartment; (4) that all three victims were found with the electrical cords still in place around their necks; (5) that the victims' hands and feet had been bound with clothing; (6) that the two young victims were staged with their shirts displaced, but their underwear still on; and (7) that Ms. Yarbough was found fully clothed. In fact, the detectives fed Sharrif that nonpublic information and then misrepresented to the prosecutor, in reports and orally, that it had originated with Sharrif.

5.      Employing physical and verbal threats, as well as homophobic and racial slurs, the same detectives went on to coerce Tony into signing a separate, false and fabricated, written confession. The defendant detectives fabricated the written confession to include their false theory of the crimes, as well as non-public facts about the crimes that had been held back from the public.

6.      These NYPD officers then concealed from the prosecution and defense counsel the improper tactics they had used to get the coerced and fabricated statements, which they falsely attributed to Sharrif and Tony. The officers' misrepresentations led the prosecution to charge Sharrif with three counts of second degree murder.

7.      In the end, Sharrif spent almost twenty-two years—the entirety of his youth and more than half of his life, from the age of fifteen until he was thirty-seven years old—wrongfully

imprisoned for the Yarbough, Barnes, and Knox murders. Tony also spent almost twenty-two years wrongfully imprisoned for the murders.

8.      In 2013, the New York City Office of the Chief Medical Examiner ("OCME") conducted DNA testing, for the first time, on the biological material left by Ms. Yarbough's attacker underneath her fingernails during the murder. That DNA testing finally proved both Sharrif and Tony's innocence. The testing definitively excluded Sharrif and Tony as the murderers of Ms. Yarbough, Ms. Barnes, and Ms.Knox, and showed that another man had been in the Yarbough apartment that June night and had committed the murders. It also revealed that, while Sharrif and Tony were wrongfully incarcerated, the same as-yet-unidentified man who killed Tony's mother, sister, and sister's best friend had gone on to commit another drug-related strangulation murder: that of Migdalia Ruiz in 1999. Strikingly, in Ms. Ruiz's case, as in the murders for which Sharrif was wrongly convicted, the killing occurred during the early morning hours and appeared to be drug related, the victim's body was left in a residential building, and the victim was strangled with a ligature that was left on the body. Just like Ms. Yarbough, Ms. Ruiz was last seen in the company of two as-yet-unidentified, but drug-connected, men.

9.      Through this civil rights action, on Sharrif's behalf, Tiffany Wilson—Sharrif's youngest sister and the administrator of his Estate—seeks to bring the Defendants' misconduct to light and to ensure they are held accountable for their actions. Ms. Wilson also seeks justice for the youth and years of his short life that her brother lost as a result of his unjust conviction, as well as for his tragic, wrongful death at the age of thirty-eight.

## JURISDICTION AND VENUE

10.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Sharrif Wilson's rights as secured by the United States Constitution.

11.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

12.     Supplemental jurisdiction over Ms. Wilson's state law claims exists pursuant to 28 U.S.C. § 1367(a).

13.     Mr. Wilson's Estate has complied with the requirements of New York General Municipal Law Section 50-i by making and serving a notice of claim on the Corporation Counsel of the City of New York on April 21, 2014, prior to Sharrif's death. The notice was served within the time required by the New York General Municipal Law Section 50-e. More than thirty days have elapsed since the service of that notice, and no offer of settlement has been made.

14.     At the request of the City of New York, prior to his death, Sharrif Wilson submitted to a hearing pursuant to New York General Municipal Law Section 50-h.

15.     Venue is properly laid in the Eastern District of New York under U.S.C. § 1391(b), in that this is the District in which the claim arose.

## JURY DEMAND

16.     Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the United States Constitution and Fed. R. Civ. P. 38(b).

## PARTIES

17.     Plaintiff Tiffany Wilson is the administrator of the Estate of Abdul Sharrif Wilson, is a citizen of the United States, and has been at all times relevant to this Complaint a citizen and resident of Bronx County and the State of New York. Ms. Wilson's brother Sharrif passed away on January 10, 2015. Ms. Wilson was appointed the Administrator of Mr. Wilson's Estate by the Surrogate's Court of the State of New York, New York County, on May 11, 2015.

18.     Defendant City of New York was and is a municipality that is a political subdivision of the State of New York, was the employer of the individual defendants, and is and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the New York City Police Department ("NYPD") and the Office of the Chief Medical Examiner of the City of New York ("OCME").

19.     Defendant Detective Phillip Grimaldi was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

20.     Defendant Detective John DeCarlo was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

21.     Defendant Detective Peter McMahon was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

6

22.     Defendant Detective Arthur Williams was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

23.     Defendant Detective Robert Izzo was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

24.     Defendant Detective Edward Feit was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

25.     Defendant Lieutenant James Luongo was at all times relevant to this Complaint a duly appointed and acting Lieutenant of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to

indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

26.     Defendant Police Officer Richard Bradford was at all times relevant to this Complaint a duly appointed and acting police officer of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

27.     Defendant Police Officer Marco Venezia was at all times relevant to this Complaint a duly appointed and acting police officer of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

28.     Defendant Dr. Jonathan L. Arden at all times relevant to this complaint was a duly appointed and acting Deputy Chief Medical Examiner in the OCME, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

29.     Defendant Detective John Doe #1, whose actual name Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John Doe #1," was at all times relevant to this Complaint a duly appointed and

acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

30.     Defendants Does #2 through 10, whose actual names Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designations "John Doe" and "Jane Doe," represent those officers, detectives, supervisors, and/or other agents and employees of the NYPD or the OCME, acting under color of law and in their individual capacities within the scope of employment or agency pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York, who participated in the misconduct described herein. They are entitled to indemnification under New York General Municipal Law Section 50-k and by contract. They are sued in their individual capacities.

## FACTS

31.     Sharrif Wilson was just 15 years old on June 18, 1992—the day his friend Tony Yarbough's mother, younger sister, and sister's best friend were brutally murdered.

32.     Sharrif and Tony were both gay, and, while not in a romantic relationship, they had met about four months prior to the murders and had become friends.

33.     Though Sharrif's family lived in the Bronx, the day prior to the murders, June 17, 1992, Sharrif had stayed overnight with another friend who lived near Tony's apartment in Coney Island. Sharrif was planning to continue staying with that friend for a few days.

**The Yarbough Family**

34.     Tony lived with his mother, Annie Yarbough, and his half-sister, Chavonne Barnes, at 2836 West 23rd Street, Apartment 1-N, in Coney Island, New York.

35.     In June 1992, Annie Yarbough was addicted to heroin; although she received treatment for heroin addiction in a methadone clinic at Coney Island Hospital, she continued to use drugs. Because of her drug habit, Ms. Yarbough often had strangers in the apartment to buy, sell, and use drugs.

36.     In 1992, Tony's half-sister Chavonne Barnes was twelve years old and attended middle school.

37.     Twelve-year-old Latasha Knox lived in the same apartment complex, was Chavonne Barnes' best friend, and often stayed overnight in the Yarbough's home.

**The Night of June 17 and Early Morning of June 18, 1992**

38.     On June 17, 1992, Tony Yarbough left the apartment he shared with his mother and younger sister in the early evening, and did not return until the next morning.

39.     That evening, Tony met up with Sharrif in Coney Island. The two teenagers spent the evening and into early morning hanging out with several friends in Coney Island, listening to music at a Coney Island amusement park, socializing in the West Village in Manhattan, and walking through Prospect Park in Brooklyn.

40.     Meanwhile, in the Yarbough apartment in Carey Gardens, twelve-year-olds Chavonne Barnes and Latasha Knox had a sleepover in the apartment that night.

41.     Throughout the late evening of June 17 and into the early morning of June 18—as Chavonne and Latasha slept—Annie Yarbough was in her apartment, using drugs with several people, including Charnette Loyal and two as-yet-unidentified men.

42.     At some point late that night, Ms. Loyal witnessed Annie Yarbough and one of the two men in the apartment get into an argument over drugs; during that dispute, the man pulled a knife and threatened Ms. Yarbough's life. Ms. Loyal left the apartment and did not return.

43.     The last identified witness to see Ms. Yarbough and the girls alive—Latasha Knox's grandmother Clara Knox—reported that, when she left the Yarbough apartment at around 1:30 a.m., an as-yet-unidentified man was still in the apartment alone with Ms. Yarbough and the sleeping Chavonne Barnes and Latasha Knox.

44.     Sometime after Clara Knox left, Ms. Yarbough, Chavonne Barnes, and Latasha Knox were violently attacked. Fighting for their lives, Ms. Yarbough struggled with their assailant, getting his skin cells lodged underneath her fingernails. Tragically, Ms. Yarbough lost that fight. The attacker then repeatedly stabbed Ms. Yarbough, Chavonne, and Latasha, strangled them, tied them up, and left the two younger victims' bodies in a state of undress, before leaving the apartment.

**Tony Yarbough Discovers and Reports the Murders**

45.     Shortly before 4 a.m. on June 18, 1992, a friend named Ron Carrington drove Tony and Sharrif from Manhattan, where they had been socializing, to Brooklyn. Carrington dropped Tony and Sharrif off near Prospect Park.

46.     Tony and Sharrif went in to Prospect Park together around 4 a.m., and remained in the park until daybreak, around 6 a.m.

47.     In order to help his mother get his sister ready for school and clean the apartment before expected visitors arrived later that day, Tony had arranged with his mom that he would be home early that morning. As a result, at daybreak around 6 a.m., Tony and Sharrif walked to the subway and rode the D train to the Stillwell Avenue station in Coney Island.

48.     Sometime after 6:30 a.m., Sharrif said goodbye to Tony in front of Tony's building, and returned to the building where he was staying a block away, at 2949 West 23rd Street. Sharrif did not enter the Yarbough apartment that morning.

49.     After Sharrif left, Tony proceeded alone into his building at 2836 West 23rd Street. When he arrived at his apartment, Tony noticed that the front door was open.

50.     The apartment was dark, and Tony could not see very well. He almost immediately noticed that something was wrong, and quickly discovered his mother and sister's dead bodies. Terrified and frantic, Tony then ran out of the apartment.

51.     On the street, Tony ran into his uncle, Major Yarbough, who was waiting for a bus on 23rd Street with his child, who is disabled. Tony was visibly upset at that time, and was crying. He told Major Yarbough that everybody in his apartment was dead, and that he was scared to return to the apartment by himself.

52.     As soon as the bus arrived to care for and transport Major Yarbough's disabled son, Yarbough took Tony back into the building to call the police from a neighbor's apartment.

53.     A few minutes later, at approximately 7:20 a.m., two uniformed police officers—defendants Officer Ricky Bradford and his partner Officer Venezia—arrived at the apartment building. At the time the officers arrived, Tony was crying and visibly upset. The officers used flashlights as they entered the apartment. Although the officers initially asked Tony to accompany them into the dark apartment, he began to cry audibly again soon after entering.

54.     Seeing that Tony was distraught, one of the officers asked Tony to wait outside in front of the building. Tony followed the officer's instructions and left the building to wait for the officers outside.

55.     Inside, the officers ultimately found three bodies; Latasha Knox, Annie Yarbough, and Chavonne Barnes had all been violently murdered.

56.     Police found Latasha Knox on a couch in the living room. She had a number of stab wounds to her chest. Ms. Knox's body had been left on the couch with her bra pulled up to expose her breasts, but her underwear on. A cloth was tied around her neck and her hands and feet were tied.

57.     In the middle bedroom, police found the body of Annie Yarbough. Ms. Yarbough was fully clothed, but had been stabbed, and had her neck, hands, and feet bound with cloth.

58.     Police located the body of Chavonne Barnes in the back bedroom. Like Ms. Knox, Chavonne Barnes was found with her bra and shirt displaced, exposing her breasts, and with her pants pulled down to her ankles but her underwear on. Ms. Barnes had also been stabbed, and, like her mother and best friend, her neck, hands, and feet had been bound with cloth.

## THE INVESTIGATION

59.     The first responding officers called in the triple homicide, and detectives and police officers from the NYPD's 60th Precinct, Brooklyn South Homicide Squad, and Housing Police all responded. The crime scene was cordoned off, and the Crime Scene Search Unit ("CSSU") was called, as was the OCME.

60.     Detective Phillip Grimaldi of the 60th Precinct was assigned to lead the triple murder investigation, and remained the lead investigator throughout the case.

61.     Notified of the murders, Grimaldi reported to the precinct, and then to the crime scene, which was about five minutes away from the precinct by car.

62.     Detectives Peter McMahon of the Housing Police and John DeCarlo of Brooklyn South Homicide were assigned to assist Grimaldi.

63.     Grimaldi walked through the crime scene with McMahon, DeCarlo, and others. Grimaldi, McMahon, DeCarlo, and others walked into each room in the apartment and looked around.

64.     When CSSU arrived, the detectives walked through the scene again with the crime scene officers and observed their examination.

65.     Finally, the medical examiner investigator Dr. Eckert arrived, and conducted his examination of the bodies. The detectives, specifically including Detective McMahon, received an oral preliminary report of Dr. Eckert's findings.

66.     From these examinations and reports, Grimaldi, McMahon, and DeCarlo learned a number of key details about the crimes that only the true perpetrator of the crimes (and the police) would know. Chief among these was that concealed underneath the clothing tied around each victim's neck were ligatures made from lengths of electrical cord that appeared to have been cut from the electrical appliances in the house.

67.     Grimaldi, McMahon, and DeCarlo observed that electrical cords had been cut from a clock radio and an electric fan, as well as at least 4 other appliances, in the house.

68.     They further noted the positioning of each of the bodies; the locations and estimated numbers of stab wounds on each victim; and that both twelve-year-old victims had their breasts exposed but their underwear on, while Annie Yarbough was fully dressed.

**Sharrif and Tony go to the police station to assist the investigation**

69.     Meanwhile, as the scene was being secured and officers were beginning to process it, Tony waited outside. Grief-stricken, afraid, and in shock, Tony called his Aunt Carla and his brother's girlfriend Charnette Loyal, and asked them to come wait with him. At some point, a tearful Tony was directed into a police car.

Case 1:15-cv-04156-MKB-LB   Document 14   Filed 10/16/15   Page 15 of 71 PageID #: 137

70.     Unaware of the events at Tony's apartment, Sharrif had returned to his friend's house—where he had been staying—to sleep. However, when he arrived at the friend's apartment, he could not get in. Unable to gain entry and after sleeping briefly in the hallway outside the apartment, Sharrif decided to go find Tony again.

71.     When Sharrif returned to the front of Tony's building, he found numerous police cars and police personnel and saw Tony tearful and talking to police. Tony told Sharrif that his family had been murdered, but did not say much more than that. Tony did not disclose any details about what he had seen in the apartment.

72.     Officers asked Tony to accompany them to the 60th Precinct to give a statement. Having nothing to hide and wanting to help in the investigation in any way he could, Tony agreed.

73.     Sharrif accompanied the visibly distraught Tony to the precinct to comfort him and keep him company. Throughout this period of time, Sharrif's demeanor was supportive of Tony.

74.     There was no physical evidence of any violence—such as blood, scratches or other injuries—on Sharrif.

75.     There was no physical evidence of any violence—such as blood, scratches or other injuries—on Tony.

76.     Tony and Sharrif were taken to the 60th Precinct in a police car. Tony and Sharrif, along with Carla Hearns and Charnette Loyal, were at the 60th precinct by sometime before 10:30 a.m. on June 18, 1992.

**Witnesses Provide Detectives with Detailed Descriptions of the Likely Killers**

77.     At some point on June 18, 1992, Charnette Loyal provided detectives with information about two men who threatened Annie Yarbough the night before.

78.     Charnette Loyal told police that on the evening of June 17, 1992, she was using crack cocaine in the kitchen of Annie Yarbough's apartment. Annie was present with two men. One of the men was a white male named Vinnie. Annie and Vinnie got into a dispute over drugs, and Vinnie pulled a knife on Annie. He threatened to kill Annie with the knife, which was a "007 knife." While displaying the knife, Vinnie demanded his money back or another dose of heroin. Ms. Loyal agreed to go out and get his money for him. Saying he would be back that night, Vinnie then left. Ms. Loyal herself left a moment later, but did not return to the apartment that night.

79.     Ms. Loyal described Vinnie as 40 to 45 years old, 6'1" to 6'2" tall with wire-rimmed glasses, blue eyes, a cocked left eye, and sandy blond hair. He had met Annie at the Coney Island Hospital methadone clinic. He was carrying a "007 knife."

80.     Detectives took contemporaneous notes of their interview with Ms. Loyal in their memo book, but failed to produce a DD-5 documenting the interview and the information provided in it.

81.     Clara Knox also told police about seeing one or more men in Annie Yarbough's apartment in the early morning of June 18, 1992.

82.     Clara Knox told Detective Edward Feit that she had been in the apartment at approximately 1:10 a.m., on the morning of June 18, 1992, and that she had seen Annie Yarbough and a man who appeared to be Hispanic using drugs together.

83.     Upon information and belief, Ms. Knox told Feit that she had left the apartment at approximately 1:30 a.m., leaving Annie Yarbough alone with the unidentified drug-using man, and that both Chavonne Barnes and Latasha Knox, Ms. Knox's granddaughter, were asleep in the apartment when she left.

84.     Ms. Knox was the last identified witness to see Ms. Yarbough, Chavonne, and Latasha alive.

85.     The detectives, specifically including lead investigator Grimaldi and Detective Feit, either ignored the facts in front of them and failed to investigate Annie Yarbough's drug associates, whether she was dealing drugs from her apartment, and precisely who had been in Ms. Yarbough's apartment the night of the murders, or hid the results of their investigation into these important leads.

86.     Detectives failed to investigate the conflict between Annie Yarbough and the men in her apartment the night of the murders, or hid the results of their investigation into these men.

87.     Detectives failed to investigate or identify "Vinnie," or hid the results of their investigation into Vinnie.

88.     Detectives also failed to investigate or identify the unidentified male who was the last person known to be with Annie just before the murders, or hid the results of their investigation into this unidentified male.

**Detectives Fabricate an Initial "False Exculpatory" Statement by Tony Yarbough**

89.     Eventually, at some point that morning, detectives came and separated Tony and Sharrif for questioning. They asked each boy separately to account for his whereabouts the previous day and night.

90.     Tony was initially interviewed by Detectives Robert Izzo and Arthur Williams.

91.     During that interview, Tony told Izzo the truth about what had happened the previous night: that he and Sharrif had gone to the West Village in Manhattan the night before, that they were driven by Ron Carrington from Manhattan to Prospect Park around 4 a.m., that they took the subway to Coney Island around 6 a.m., that they were in front of the apartment around 6:30

a.m., that they separated, and that Tony had gone into his apartment and discovered the bodies a few minutes later.

92.     Both the West Village and Prospect Park—where Sharrif and Tony had spent the previous night socializing—were known to the NYPD in the early 1990s as areas where LGBT people congregated.

93.     During his interview with Izzo, Tony was open with the detective about his sexual orientation, described his participation and competition in gay dances, and acknowledged that he and Sharrif had been hanging out late into the night and early morning in the West Village and Prospect Park, socializing with other LGBT persons.

94.     As detailed in the psychological research of Dr. Gregory M. Herek and others, in the early 1990s, at the height of the HIV epidemic, a pervasive and accepted culture of homophobia had led to broad-based discriminatory beliefs about gay men, including malicious and false stereotypes that gay men had questionable moral character, willingly engaged in reckless sexual activity, were hypersexual, and had a proclivity towards pedophilia. These discriminatory beliefs were particularly strong against gay men of color, who were subject to both homophobic and racist stereotyping.

95.     During his interview with Izzo, Tony also provided the detective with his friend Ron Carrington's beeper number.

96.     Meanwhile, in another room in the precinct, a rotating group of three to four detectives questioned Sharrif over the next several hours.

97.     Sharrif told them the truth: he had nothing to do with Ms. Yarbough, Ms. Barnes, or Ms. Knox's deaths, and that he knew nothing about them. He also truthfully and independently corroborated Tony's detailed account of the previous night's events.

98.     At some point that afternoon, Izzo spoke by phone with Ron Carrington.

99.     Ron Carrington told Izzo the same version of events as Tony had told Izzo: that he drove

Sharrif and Tony to Prospect Park at about 4 a.m.

100.    Despite the similarity among Sharrif, Tony, and Ron Carrington's statements, Detective

Izzo fabricated false details in Tony's account of the previous night's events, thereby

manufacturing suspicious discrepancies among Sharrif, Tony, and Ron Carrington's accounts,

and wrote a false report of Tony's interview in a DD-5 that included these false details.

## THE INTERROGATIONS

101.    Prior to aggressively interrogating Sharrif and Tony over the coming hours, Detectives

Grimaldi, DeCarlo, McMahon, and Williams met with supervisor Lieutenant James Luongo.

102.    Following the meeting, Lieutenant Luongo was present in the 60th precinct throughout

the day, and supervised the interrogations over the next several hours.

103.    Upon information and belief, Luongo was present for misconduct by the defendant

detectives, including the unconstitutional coercion and fabrications described below.

104.    Lieutenant Luongo knew or should have known that, while he was present, the defendant

detectives were engaging in misconduct, including the unconstitutional coercion and fabrications

described below.

### The Detectives Fabricate and Coerce a False Oral Confession from Sharrif

105.    Despite Sharrif's truthful statements of innocence and corroborated alibi statement,

Detectives Grimaldi, DeCarlo, and McMahon kept him in the interview room at the 60th

Precinct, and continued to interrogate him.

106.    As Defendants knew, Sharrif had barely slept the previous night and was exhausted. He was so tired that he nodded off repeatedly as the officers questioned him. Instead of allowing Sharrif to go home or to sleep, Grimaldi, DeCarlo, and McMahon kept questioning him.

107.    Each time Sharrif fell asleep, DeCarlo would slap him in the head to awaken him, and demand he confess to the crimes.

108.    During the interrogation, Sharrif told Grimaldi, DeCarlo, and McMahon that he was only fifteen years old. Furthermore, at fifteen, Sharrif's young age would have been objectively apparent to a reasonable officer.

109.    Detectives Grimaldi, DeCarlo, and McMahon each were aware that under New York law, prior to interrogating a child under the age of sixteen, they were required to notify the parent or other person legally responsible for the child's care that they had the child in custody and were intending to question him, and that under NYPD policy, they were required to follow special procedures to accommodate for Sharrif's young age.

110.    Detectives Grimaldi, DeCarlo, and McMahon ignored the fact that Sharrif was fifteen, and did not call a parent or guardian for Sharrif. Instead, they later falsely reported both orally and in their written report that Sharrif told them he was 17 years old and that his date of birth was August 18, 1974, instead of August 18, 1976.

111.    Keeping him alone and isolated in the interview room, the detectives interrogated Sharrif for hours; with DeCarlo repeatedly slapping Sharrif on his head and the detectives repeatedly slamming their hands on the table, Grimaldi, DeCarlo, and McMahon demanded that Sharrif tell them that he and Tony Yarbough had strangled and stabbed the three victims and then moved their bodies.

112.    Grimaldi, DeCarlo, and McMahon falsely told Sharrif that Tony had already confessed.

20

113.     Sharrif repeatedly, and with mounting frustration and increasingly severe exhaustion, denied that he had been involved.

114.     The detectives—Grimaldi, DeCarlo, and McMahon—failed to take any notes of this exculpatory portion of their interrogation and refused to accept Sharrif's truthful denials. Instead they made it clear to Sharrif that the interrogation would continue until Sharrif told them what they wanted to hear: that Sharrif and Tony had strangled and stabbed the victims and then moved their bodies around the apartment.

115.     The interview room was small, and the three detectives were big. As the questioning continued Sharrif grew more and more afraid.

116.     Several times, the detectives, specifically including DeCarlo, followed the demand that Sharrif confess with another slap to Sharrif's head.

117.     Throughout the interrogation, Grimaldi, DeCarlo, McMahon, and the other detectives improperly fed Sharrif nonpublic facts about the murders that only the police and the true perpetrator could have known.

118.     The interrogating detectives insisted that Sharrif and Tony had killed Annie Yarbough, Chavonne Barnes, and Latasha Knox, and refused to listen to Sharrif's truthful statements of innocence.

119.     After hours of interrogation, the detectives falsely promised Sharrif that if he just told them what they wanted to hear, they would let him go home.

120.     These tactics were the last straw. Fifteen-year-old Sharrif's will, already worn down by lack of sleep, was no match for the detectives' interrogation tactics. After hours, Grimaldi, DeCarlo, and McMahon finally overbore Sharrif's will. Sharrif was tired and afraid, and felt both scared and overwhelmed as the officers kept coming at him. The detectives convinced Sharrif

that the only way to end his ordeal was to tell them what they wanted to hear. After hours,

Sharrif succumbed and said that he and Tony had done it, so that he could go home as promised.

121.    The interrogating detectives Grimaldi, DeCarlo, and McMahon then took advantage of

Sharrif's overborne will to fabricate and coerce a false confession from him. Sharrif was actually

innocent, but the detectives coerced and manipulated him into giving a "confession" that

appeared both reliable and incriminating because it contained nonpublic facts about the crime

that only the police and the true perpetrator could have known, including, but not limited to, that:

    a.  Annie Yarbough, Chavonne Barnes, and Latasha Knox had been stabbed

        numerous times in their chests;

    b.  Both of the twelve-year-old victims had their breasts exposed, but their underwear

        on;

    c.  All three victims had clothing tied around their hands and feet;

    d.  Electrical cords had been cut from the electrical appliances in the house, including

        a radio and a fan; and

    e.  Lengths of electrical cord, which appeared to have been cut from those electrical

        appliances in the house, were tied around each victim's neck.

In fact, the detectives fed Sharrif that nonpublic information during the interrogation, and then

misrepresented that it had originated with him. Sharrif did not volunteer any of these nonpublic

details. Moreover, he could not have volunteered any of these details because he was completely

innocent and did not know any nonpublic information about the crimes.

122.    In addition to feeding Sharrif this nonpublic information and coercing him into adopting

it in his "confession," the interrogating detectives also fed Sharrif their theory of Sharrif and

Tony's motive for committing the crimes: that Sharrif and Tony were both gay and that Tony's mother had disapproved of Sharrif being in her home.

123.    In fact, however, Sharrif and Tony were not and had not been in a romantic relationship, and Tony's mother had been accepting of her son's sexual identity.

124.    Sharrif's will overborne and having assented to their theory of the crime, the investigators allowed Sharrif to sleep, and turned their attentions to coercing a similarly damning confession from Tony.

**Detectives Coerce Tony Yarbough into Signing a False "Confession"**

125.    After Detective Izzo's initial interview with Tony, Tony was instructed to wait in the area where that interview had taken place.

126.    After waiting alone for several hours, another detective escorted Tony to a windowless interrogation room.

127.    Tony had been awake for approximately 24 hours when the interrogation began.

128.    At least five detectives had contact with Tony while he was in the interrogation room. These included defendants Grimaldi, McMahon, DeCarlo, Williams and others, including but not necessarily limited to defendant John Doe #1.

129.    The detectives immediately started accusing Tony of participating in the murders.

130.    During the interrogation, Tony was open with the detectives about his sexual orientation, described his participation and competition in gay dances, and acknowledged that he and Sharrif had been hanging out late into the night and early morning in the West Village and Prospect Park, socializing with other LGBT persons.

131.   Detective McMahon slammed down a Polaroid picture of Tony's murdered mother's body and, at the same time, said, in substance, "Only a faggot would do something like this," and "A crack baby would do something like this."

132.   When Tony refused to sign a false confession, Detective McMahon struck Tony multiple times about the head and face with an open hand.

133.   Detective McMahon threw a chair against the wall during the interrogation.

134.   Detective McMahon repeatedly called Tony a "faggot" and other derogatory names referring to his sexual orientation.

135.   Detective McMahon also used racial slurs, calling Tony a "crack baby."

136.   Detective McMahon grabbed Tony by the clothing.

137.   When Tony continued to refuse to make a statement, Detective DeCarlo unholstered his firearm and said, in substance, "I could blow your brains out and get away with it by saying that you reached for my gun and it was self-defense."

138.   Tony asked to leave but was told he could not leave.

139.   The detectives never informed Tony of his *Miranda* rights.

140.   The detectives falsely told Tony that Sharrif had already voluntarily confessed, by saying, in substance, "Your buddy gave you up."

141.   Detective McMahon asked Tony if he would sign a statement confessing to the murders if he brought Sharrif in to confront him to his face.

142.   Believing Sharrif would do nothing of the sort, Tony said yes.

143.   One of the interrogating detectives left Tony's interrogation room, and went down the hall to where Sharrif was sleeping in a separate interrogation room. The detective awakened Sharrif, who was exhausted, and told him that he had to go in to see Tony and tell Tony that they

24

had committed the crimes. The detective falsely told Sharrif he had to do this, so that they could go home.

144.    Sharrif's will overborne, he believed the detective's false promise that he and Tony would be allowed to go home and their ordeal would be over if he just did this. Fifteen-year-old Sharrif followed the detective to the interrogation room where Tony was being held.

145.    Without telling Tony about the tactics they had employed, and continued to employ, to obtain the false and fabricated oral confession from Sharrif, and in order to further manipulate Tony, the detectives brought Sharrif to the interrogation room.

146.    From the door of Tony's interrogation room, Sharrif told Tony to "give up."

147.    Toward the end of Tony's interrogation, John Doe #1, an unidentified detective who participated in the interrogation, told Tony that he believed Tony was innocent. John Doe #1 told Tony that if he just signed a confession, the interrogation would end and he could tell the judge that the signature on the confession did not match the handwriting of the statement, and that the words of the confession were not Tony's. John Doe #1 falsely, wrongfully, and maliciously advised Tony that the judge would believe him under those circumstances.

148.    Upon information and belief, the defendant officers, specifically including but not limited to Lieutenant Luongo, Grimaldi, DeCarlo, McMahon, and Williams, were present for or immediately made aware of the misconduct by John Doe #1.

149.    Finally, after John Doe #1's assurances, Tony signed a confession that the detectives had previously written out.

150.    None of the information in the written confession about the murders was provided by Tony.

151.    The detectives asked Tony to make specific changes on the written confession and to initial the changes. Tony complied only so that he could end the interrogation, not because he actually intended to make any "corrections."

152.    Upon information and belief, the detectives were trained that including corrections in a confession, if actually volunteered by the suspect, strengthens the reliability and credibility of the confession. The purpose of the "corrections" the detectives asked Tony to make was to falsely convey to the prosecutors and jury that the confession accurately reflected information provided by Tony, even though the detectives knew that the information in the confession was not provided by Tony, but instead had been fabricated by the detectives.

### Reported Discovery of Two Serrated Steak Knives at the Crime Scene

153.    Meanwhile, on the evening of June 18, 1992, while Tony was being interrogated, Detective Edward Feit and Detective Sergeant Murnane reported that they returned to the crime scene at 2832 West 23rd Street, Apartment 1-N, to conduct an additional search of the apartment.

154.    Detective Feit and Detective Sergeant Murnane reported that during their search, they recovered two steak knives. They reported that the first knife was recovered from a countertop in the kitchen and dining area adjacent to the stove. And the second knife was recovered from the floor next to the west wall of the living room and adjacent to the left side of the couch.

155.    The detectives knew that the victims had suffered multiple sharp force traumas, and that the stabbing instrument or instruments had not yet been recovered.

156.    The crime scene had already been thoroughly searched by CSSU earlier in the day, and no knives or other weapons had been recovered.

157.    Upon information and belief, Detective Feit and Detective Sergeant Murnane reported

back to Grimaldi and the interrogating detectives that they would be reporting the recovery of

two steak knives from the crime scene.

158.    Upon information and belief, by the evening of June 18, 1992, Detective Grimaldi and

the other detectives believed that one or both of the steak knives reportedly recovered by Feit and

Murnane was the knife that had been used in the murders.

159.    However, this proved to be a false conclusion. Later, on July 14, 1992, the OCME

reported that forensic analysis performed on both of the steak knives demonstrated that there was

no blood or any trace of blood on either of the knives. Neither of the steak knives was the murder

weapon.

**The Detectives Fabricate and Coerce a Videotaped Confession from Sharrif**

160.    To maximize the impact of the confession, the officers had it video-recorded.

161.    The Kings County District Attorney kept an Assistant District Attorney on call as the

"riding" ADA, who would take videotaped statements from suspects. Upon information and

belief, the detectives contacted Peter Gray, who was the "riding" ADA that evening.

162.    ADA Gray arrived at the 60th Precinct late that night. Upon arrival, Mr. Gray met with

Detective Grimaldi and reviewed the case with him.

163.    Despite the fact that the only nonpublic facts about the Yarbough, Barnes, and Knox

murders had originated with the interrogating detectives, and not Sharrif Wilson or Tony

Yarbough, Grimaldi, McMahon, and DeCarlo reported to ADA Peter Gray that Sharrif Wilson

had confessed after a lawful interrogation, and that the non-public details in the confession had

originated with Sharrif. They moreover failed to report to Mr. Gray either that Sharrif was only

fifteen years old or their own misconduct during his interrogation, such as a) DeCarlo's hitting

Sharrif in the head; b) their false promise that if he would confess, he could go home; c) their failure to record Sharrif's exculpatory denials; d) their refusal to allow Sharrif to sleep; and e) their feeding Sharrif the nonpublic facts and details about the crime. Instead, they told prosecutors that within five to ten minutes of being questioned, Sharrif Wilson, who they alleged had claimed to be seventeen years old, had spontaneously and without prompting "confessed" to them in narrative form.

164.    In addition, despite the fact that Tony's written confession had been wholly fabricated by the interrogating detectives, and the only nonpublic facts about the murders had originated with the interrogating detectives, Grimaldi, McMahon, and DeCarlo reported to ADA Gray that Tony Yarbough had voluntarily given and signed a written confession. They moreover failed to report to Mr. Gray their misconduct during the interrogation, such as their verbally and physically coercive and manipulative tactics, their use of homophobic and racist slurs, or their fabrication of the details in the written statement they attributed to Tony. Instead, they told prosecutors that Detective McMahon had written out the narrative confession as Tony related the circumstances to him, that he then read the statement back to Tony, and Tony initialed written corrections to the statement and voluntarily signed it.

165.    After speaking with the detectives, shortly after 11 p.m., ADA Peter Gray met with Tony to ask him to make a videotaped statement.

166.    On video, prior to asking Tony to make the video statement, ADA Gray read Tony his *Miranda* rights. This was the first time Tony had been advised of his rights by anyone. On video, Tony immediately asked for an attorney. After Tony invoked his right to counsel, ADA Gray stopped the interview, and no videotaped statement from Tony was taken.

167.    Meanwhile, prior to ADA Gray's arrival at the 60th Precinct, detectives had awakened Sharrif and reviewed their story with him.

168.    Based on the information Grimaldi had received from Feit and Murnane, Grimaldi fed Sharrif an additional fact. Grimaldi told Sharrif that the knife Tony had used was a "steak knife."

169.    The detectives, including Grimaldi, wrongly believed that one or both of the steak knives—that had been recovered by Feit and Murnane that evening—was the actual murder weapon. Sharrif had no independent knowledge of what knives or other weapons had been recovered from the crime scene. Grimaldi fed this false fact to Sharrif.

170.    The interrogating detectives, including Grimaldi, coached Sharrif again on the details of their story, including the new detail about the "steak knife," and repeated their false promise to him that if he just convinced the ADA of the story, then he would be allowed to go home.

171.    Upon information and belief, despite the fact that the detail about the steak knife had originated with the interrogating detectives and not Sharrif, Grimaldi, McMahon, and DeCarlo misrepresented to ADA Gray that the steak knife detail originated with Sharrif.

172.    At 11:19 pm—over 12 hours after the fifteen-year-old first arrived at the 60th Precinct—a videotaped statement was taken from Sharrif Wilson. Though ADA Gray conducted the interview, Detectives Grimaldi and McMahon were in the room with Sharrif and Gray at all times, ensuring that Sharrif stuck to their story.

173.    By not video or audio taping any of Sharrif's prior interactions with the detectives over the previous 12 plus hours, by failing even to take notes of their exculpatory interviews with him, by selectively videotaping only the end result of their interrogation, and also by falsely summarizing what had occurred during their lengthy interrogation of Sharrif in a false and

29

misleading DD-5, Grimaldi, McMahon, DeCarlo, and Williams created a grossly distorted and fabricated account of the interrogation and its result.

174.    To other viewers, not privy to the true circumstances under which the confession was obtained, the coerced and manipulated videotaped confession appeared highly inculpatory. Viewed without knowledge of the coercion and manipulation that led to it—especially when combined with the interrogating officers' untruthful representation that, within five to ten minutes of being questioned, Sharrif had spontaneously and without prompting "confessed" to them in narrative form—the videotape appeared to show Sharrif agreeing that he and Tony Yarbough were responsible for the murders and offering up important facts and details about the murder that only the police and the true perpetrator could have known. Those facts and details included that wrapped around the neck of each victim was a ligature made from electrical cord that had been cut from electrical appliances in the house.

175.    In addition to those incriminating nonpublic facts, Sharrif appeared to spontaneously volunteer both motive and murder weapon—that Tony's mother disapproved of their relationship, and that Tony had used a steak knife to commit the murders. In fact, that false information, too, had originated with the police.

176.    On June 18, 1992, Sharrif Wilson and Tony Yarbough were arrested for the murders of Annie Yarbough, Chavonne Barnes, and Latasha Knox.

### Dr. Jonathan Arden Provides a Fabricated and Knowingly False
### Medical Opinion Regarding Time of Death

177.    The next day, on June 19, 1992, Dr. Jonathan Arden conducted the autopsies of the three murder victims.

178.    Dr. Arden was aware of the time that the bodies were discovered and the time that death was pronounced. OCME records document that NYPD officers had arrived on the scene of the

Yarbough, Barnes, and Knox homicides at 7:20 a.m., and that Emergency Medical Services had pronounced the deaths at 7:30 a.m.

179.    In 1992, in addition to Medical Examiners, the OCME employed Medical Investigators, whose role it was to examine a body at the scene of death and record on-scene observations for use by the Medical Examiner who conducted the autopsy.

180.    On June 18, 1992, at 10:25 a.m., OCME Medical Investigator Dr. Eckert had arrived at the Yarbough, Barnes, and Knox homicide scene.

181.    Dr. Eckert had examined each of the victim's bodies, and made initial observations at the scene.

182.    Specifically, Dr. Eckert recorded in his OCME Investigator's Report that at approximately 10:25 a.m., all three of the victims' bodies were in *rigor*, which he further described as "fixed."

183.    Dr. Eckert also recorded that the body of Latasha Knox was "cool to touch."

184.    At the autopsies, Dr. Arden examined the stomach contents of each of the three victims. He described the gastric contents of Annie Yarbough, Chavonne Barnes, and Latasha Knox as all containing amounts of thick liquid.

185.    Based on the condition of the bodies at the time they were found, his autopsy findings, and other information available to him, Dr. Arden was aware that the medical evidence demonstrated that the murders had occurred prior to 4:30 a.m. on June 18, 1992.

186.    Upon information and belief, Dr. Arden spoke with the detectives investigating the homicides, specifically including Detective Grimaldi, and was told that Sharrif and Tony had given confessions stating that they committed the murders after 6:30 a.m. on June 18, 1992, and that the boys had a corroborated alibi for the previous night until at least approximately 4:00 a.m.

31

187.    Dr. Arden failed to include any opinion about time of death in any of his written reports for the Yarbough/Barnes/Knox homicides.

188.    Dr. Arden also failed to investigate or failed to document the investigation of pertinent information regarding time of death, including what the credible evidence indicated about when the three victims had last been seen alive.

189.    Upon information and belief, Dr. Arden nonetheless falsely told prosecutors that the murders could have taken place after 6:30 a.m.—when the detectives had evidence that Sharrif and Tony had been seen outside the apartment building—and withheld from the prosecutors the information that the medical evidence demonstrated that the murders had occurred prior to 4:30 a.m. on June 18, 1992—when the detectives were aware that both Sharrif and Tony had alibis.

### Officer Ricky Bradford Falsely Tells Prosecutors that Tony Appeared Calm and Unaffected After the Murders

190.    When Officer Ricky Bradford first arrived at the scene on June 18, 1992, he observed Tony in tears and obviously upset and emotional.

191.    Nonetheless, Officer Bradford misrepresented in police reports and to prosecutors that Tony's demeanor was "very flat", that he appeared "calm," and that he was not crying shortly after he had discovered his mother, sister, and sister's best friend's bodies.

### PROSECUTION AND CONVICTION

192.    On or about June 24, 1992, Sharrif Wilson was indicted by a Kings County grand jury for three counts of second degree murder. He was arraigned on these charges and pleaded not guilty.

193.    Sharrif's prosecution was initially joined with Tony Yarbough's.

194.    Sharrif's defense attorney and Tony Yarbough's defense attorney each moved respectively to suppress Sharrif and Tony's "confessions." At the joint pretrial *Huntley* hearing, Grimaldi and Williams repeated their and McMahon and DeCarlo's out-of-court

misrepresentations about the confessions and how they were elicited. Based on these misrepresentations, Justice Robert S. Kriendler denied the motions.

195.    Sharrif and Tony were tried separately, and Sharrif was tried first from January 10 through January 19, 1994.

196.    Prior to Sharrif's trial, he was offered a plea agreement with a promised sentence of three-to-nine years, if he would be willing to testify against Tony.

197.    Insistent on his innocence and believing that the truth would come out at trial, Sharrif declined that agreement.

198.    At trial, Grimaldi again gave false and misleading testimony, making the same misrepresentations to the Court and jury that he had already made to prosecutors. Grimaldi testified that Sharrif had told the detectives that he was 17 years old; that Sharrif had, without any police prompting and after only five to ten minutes of police questioning, "confessed" to them in narrative form and had volunteered nonpublic facts about the murders; and that Sharrif had voluntarily repeated that story on videotape without any coaching, prompting, or preparation later that night.

199.    Assistant District Attorney Suzanne Mondo emphasized Detective Grimaldi's testimony, telling the jury that Sharrif gave Grimaldi a statement "in excruciating detail about what [he and Tony Yarbough] did to these people" and then again gave that statement on videotape.

200.    The false, involuntary, police-manipulated, and fabricated oral and videotaped confessions—along with police misrepresentations about how they were elicited—were the only pieces of evidence presented against young Sharrif Wilson at trial.

201.    Sharrif testified in his own defense, as best he could, explaining to the jury what had happened in the 60th Precinct on June 18, 1992: that he was kept in the precinct for hours; that

he was tired and afraid; that he told officers that he was 15 years old, but they questioned him without a parent or guardian present; that he was questioned by as many as three detectives at a time; that they had insisted he tell them that he and Tony Yarbough had stabbed and strangled Annie Yarbough, Chavonne Barnes, and Latasha Knox, and then moved their bodies around the apartment; that one of the detectives had hit him on the head and the detectives had shouted at him; that they told him he could go home if he just told them what they wanted to hear; and, most of all, that he was innocent. But his testimony could not overcome the seemingly powerful proof of his guilt presented by Grimaldi, McMahon, and DeCarlo's lie that Sharrif knew and had spontaneously recounted nonpublic detailed facts about the murders.

202.    On January 19, 1994, the jury found Sharrif Wilson guilty of all three counts of second degree murder.

203.    Shortly after Sharrif's conviction, he was transported by detectives to a meeting with ADA Suzanne Mondo at the Kings County District Attorney's Office. At that meeting, ADA Mondo explained to Sharrif that he was facing 27-years-to-life imprisonment, but that she would reduce the punishment to nine-years-to-life if he would be willing to testify against Tony Yarbough.

204.    At the meeting, Sharrif advised ADA Mondo and the detectives present that he was innocent of the crime, and that he had told the truth at trial.

205.    Upon information and belief, the detectives again misled the prosecutors or failed to correct their prior misrepresentations, falsely repeating yet again or at minimum failing to correct the misrepresentation that Sharrif had told the detectives that he was 17 years old; that Sharrif had, without any police prompting and after only five to ten minutes of police questioning, "confessed" to them in narrative form and had volunteered nonpublic facts about the murders;

34

and that Sharrif had voluntarily repeated that story on videotape without any coaching, prompting, or preparation later that night.

206.    From the age of fifteen until he was seventeen, Sharrif had been in jail pre-trial—first on Riker's Island with prisoners much older than he and then in a juvenile facility. Other inmates had identified Sharrif as gay. Sharrif had been threatened and propositioned. He had dealt with the noise, the discomfort, and the terror for over two years. Facing the rest of his life in adult prison, Sharrif was desperate.

207.    Following his conviction, Sharrif knew that he faced, at minimum, 27 years in prison. At seventeen years old, he had never been to prison, but had already experienced pre-trial how inmates treated gay teenagers convicted of the type of crime he had been convicted of. Beyond his desperation, Sharrif was also terrified.

208.    Sharrif reluctantly agreed to the deal.

209.    Tony Yarbough was tried twice. His first trial, which began on January 21, 1994—two days after Sharrif's conviction—and lasted five days, ended in a hung jury. Sharrif testified for the prosecution at Tony's first trial.

210.    After Tony's first murder trial, Sharrif was interviewed by Probation Officer Alan Arfer, as Arfer was preparing Sharrif's presentence report for the court. In that interview, Sharrif truthfully and emphatically again denied his guilt.

211.    Tony Yarbough's second trial was held from February 8 through February 16, 1994. Sharrif again testified for the prosecution, and, at the second trial, the jury saw and heard the fabricated and coerced videotaped statement taken from Sharrif.

212.    The only evidence presented against Tony Yarbough at either of his trials was the false, involuntary, police-manipulated and fabricated oral, videotaped, written, and testimonial confessions—along with police misrepresentations about how they were elicited.

213.    On February 16, 1994, Tony Yarbough was convicted of three counts of murder in the second degree.

214.    On February 22, 1994, Sharrif Wilson was sentenced to three indeterminate terms of nine years to life imprisonment, to run concurrently. He was 17 years old.

215.    On March 15, 1994, Antonio Yarbough was sentenced to 75-years-to-life in prison.

THE EXONERATIONS

216.    Following his conviction, Sharrif appealed his conviction to the New York State Supreme Court, Appellate Division, Second Department, but on October 5, 1998, the court unanimously affirmed the judgment of conviction.

217.    In 2009, Tony Yarbough filed papers pursuant to New York Criminal Procedure Law § 440.10 moving to vacate his conviction or, in the alternative, for DNA testing. The initial § 440.10 motion was denied on procedural grounds, but the People agreed to DNA testing and Tony moved to renew and reargue.

218.    In late 2012, numerous items of physical evidence collected at the Yarbough/Barnes/Knox crime scene were made available for DNA testing, including evidence recovered from Annie Yarbough's fingernails.

**DNA Evidence Proves that Sharrif Wilson and Tony Yarbough
are Actually Innocent of the Crimes Charged**

219.    The motions to renew and reargue were still pending when the OCME reported that they had identified a single-source male DNA profile in the biological material recovered from Annie Yarbough's fingernails.

36

220.     Based on testing of reference samples from Sharrif Wilson and Tony Yarbough, the OCME excluded either Sharrif or Tony as the source of that DNA profile.

221.     In other words, DNA testing revealed that biological material had been left by a single man under Annie Yarbough's fingernails before she died, and that this unidentified man was neither Sharrif Wilson nor Tony Yarbough.

222.     Not only did the OCME's results exonerate Sharrif and Tony, they also revealed the true perpetrator: a repeat murderer who has yet to be caught.

223.     Specifically, the OCME compared the single male DNA profile recovered from Annie Yarbough's fingernails to the collected crime scene samples from other open crimes. The comparison generated a hit.

224.     The DNA hit showed that the male DNA profile from Ms. Yarbough's fingernails matched the profile of the male donor to another open homicide and sexual assault: the rape and murder of Migdalia Ruiz in 1999.

225.     At the time Migdalia Ruiz was killed in 1999, Tony and Sharrif were both in state custody.

226.     Review of the Ruiz case file revealed that late on the night of January 26, 1999, while Mr. Wilson and Mr. Yarbough were both incarcerated, Migdalia Ruiz—who, like Annie Yarbough, struggled with drug addiction—was last seen in Brooklyn in the company of at least two unidentified, but drug-connected men.

227.     Early the following morning, Ms. Ruiz's body was found underneath a stairwell inside a Brooklyn apartment building. Like Ms. Barnes and Ms. Knox, Ms. Ruiz had been disrobed from the waist down, and had been strangled. Like Ms. Yarbough, Ms. Barnes, and Ms. Knox, a ligature remained wrapped around Ms. Ruiz's neck.

228.    The murderer, who killed Annie Yarbough, Chavonne Barnes, Latasha Knox, and Migdalia Ruiz, had a peculiar modus operandi: he strangled each of his victims and then left ligatures in place around each of their necks.

229.    Beyond the DNA proof that the same male was present at both the Ruiz and Yarbough crime scenes and had physical contact with both sets of victims, comparing Ms. Ruiz's case to information the NYPD had received at the time of original Yarbough, Barnes, and Knox investigation revealed other striking similarities. Both Ms. Ruiz and Annie Yarbough were last seen using drugs with at least two unidentified men. In Annie Yarbough's case, witnesses had reported that she had gotten into a violent argument with one of the men who pulled a knife. Ms. Ruiz, Ms. Barnes, and Ms. Knox's bodies were found in states of partial undress. And, finally, the murderer's modus operandi: Ms. Ruiz, Ms. Yarbough, Ms. Barnes, and Ms. Knox were all found strangled with ligatures still in place around their necks.

230.    The murderer who brutally strangled and assaulted Migdalia Ruiz, Annie Yarbough, Chavonne Barnes, and Latasha Knox has never been caught.

**Sharrif and Tony's convictions are vacated and the indictments against them dismissed**

231.    Based on the new DNA evidence proving Sharrif and Tony's innocence, Mr. Wilson, Mr. Yarbough, and the Kings County District Attorney's Office jointly moved to vacate Mr. Wilson and Mr. Yarbough's convictions and dismiss the indictments against them.

232.    On February 6, 2014—almost twenty-two years after Sharrif and Tony were wrongfully arrested—the King's County District Attorney's Office moved to dismiss the indictments against both men.

233.    That same day, Justice Raymond Guzman of the Supreme Court, Kings County, granted

the joint motions, vacating Sharrif's and Tony's convictions and dismissing the indictments

against them with prejudice pursuant to Criminal Procedure Law § 440.10(1)(g).

234.    Sharrif Wilson and Tony Yarbough were freed from state custody on February 6, 2014.

### THE CITY OF NEW YORK HAD A POLICY, PRACTICE, OR CUSTOM OF COERCING FALSE STATEMENTS FROM WITNESSES AND SUSPECTS[1]

235.    The City of New York, by and through its final policymakers, had in force and effect

during the Yarbough, Barnes, and Knox murder investigation and for years beforehand, a policy,

practice or custom of unconstitutional misconduct in homicide investigations, including in

particular the use of coercive techniques in interviews and interrogations to obtain confessions;

the fabrication of inculpatory evidence; and the fabrication of incriminating statements from

witnesses, suspects, and arrestees by feeding nonpublic facts about the crime that only the police

and the true perpetrator would know to those witnesses, suspects, and arrestees.

236.    This policy, practice, or custom involved the use of various techniques to coerce

inculpatory statements, including without limitation: isolation, particularly separating juvenile or

otherwise vulnerable suspects or witnesses from their friends and family; subjecting individuals

to needlessly prolonged interrogations; making false promises, including the promise that a

suspect or witness will be allowed to leave the interrogation and go home if he or she makes an

inculpatory statement; the use or threat of physical violence; authoritative assertions of a

suspect's guilt, including without limitation confrontation with false inculpatory evidence; and

providing false assurances—particularly to juveniles and other vulnerable people—that the

---

[1] This case is consolidated with *Yarbough v. City of New York*, 15-cv-00516-MKB-LB (E.D.N.Y.). The allegations relating to these policies, practices, or customs of the City, though pled slightly differently than in the *Yarbough* Amended Complaint, are substantively the same.

suspect will benefit from making an inculpatory statement that minimizes the suspect's own involvement.

237.    This policy, practice, or custom also involved the use of various techniques to make false statements appear true and reliable, including, without limitation: providing a witness or suspect with non-public details about the crime that only the perpetrator or police could know, whether through leading questions or more direct communication; taking misleading steps to make coerced statements appear as if they originated from the suspect following a lawful interrogation; and selectively videotaping only a suspect's confession and not the interrogation, preparation, and rehearsal preceding the videotaped statement.

238.    Various cases demonstrate that this misconduct was pervasive within the NYPD around the time of Sharrif's interrogation. Plaintiff incorporates by reference the list of cases provided in the Amended Complaint in *Yarbough v. City of New York*, 15-cv-00516-MKB-LB (E.D.N.Y.) (Document No. 12) ¶¶ 276-85, 348-51. In particular:

      a.   In 1989, NYPD detectives coerced and fabricated false confessions from five young men in the now-infamous "Central Park Jogger" case. As in Sharrif and Tony's case, the investigating detectives developed a theory of the Central Park Jogger rape and assault that was built on stereotype, and then coerced five young men of color to falsely confess to the crime, even though no physical evidence tied the young men to the assault and alibi evidence suggested that all five were innocent. In 2002, after serving between seven and thirteen years in prison, all five had their convictions vacated and the indictments against them dismissed. In 2014, the City of New York settled a civil rights suit brought by Wise, McCray, Richardson, Salaam, and Santana for $40 million; and

b.  Willie Stuckey and David McCallum were sixteen years old at the time of the
    1985 murder for which they were wrongfully convicted. As in Sharrif and Tony's
    case, the teens quickly became the focus of the murder investigation, and each
    falsely confessed to the crime after being subjected to and threatened with
    physical violence. Though Stuckey and McCallum's statements were inconsistent
    and immediately recanted, the false confessions were the principal evidence used
    to convict them at trial. Fingerprint analysis and DNA testing conducted in 2011
    on items found at the crime scene excluded Stuckey and McCallum as
    contributors. In an unusual step, Brooklyn District Attorney Kenneth Thompson
    asked the court to vacate Stuckey and McCallum's convictions. His office
    concluded that the confessions were false, and that they included details about the
    crime that police fed the teenagers while they coerced confessions from them.
    This tactic was used by the officers who coerced Sharrif into falsely confessing to
    the triple murder. In a statement to the Wall Street Journal about the Stuckey and
    McCallum case, Thompson lamented that Brooklyn had "a national reputation as
    a place where people have been railroaded into confessing to crimes they did not
    commit." McCallum served nearly twenty-nine years in prison. Stuckey died in
    2001 of a heart attack while serving his sentence.

c.  Shabaka Shakur served twenty-seven years in prison for a 1988 double murder,
    based largely on a "confession" that NYPD detective Louis Scarcella claimed
    Shakur had given him. Shakur consistently maintained his innocence and asserted
    that the confession simply never happened, but instead was fabricated by
    Scarcella to implicate him in the murder. In June 2015, Justice Desmond Green of

the New York Supreme Court vacated Shakur's conviction, finding that there was "a reasonable probability that the alleged confession of [Shakur] was indeed fabricated." The Brooklyn District Attorney's Office declined to retry Shakur, who has since been released.

d.   In 1990, NYPD detective Louis Scarcella coerced, manufactured, and fabricated a false confession from and fabricated further evidence against David Ranta in the murder of Rabbi Chaskel Werberger. In 2013, after serving 23 years in prison for a murder he did not commit, Mr. Ranta's conviction was vacated and the indictment against him dismissed. In 2014, the City of New York settled a civil rights claim, prior to Mr. Ranta's filing suit, for a substantial sum; and

e.   Though Jabbar Washington and Hector Lopez remain incarcerated, a review of cases conducted by the New York Times revealed suspicious similarities between their confessions and the false confession of David Ranta. *See* Frances Robles, *Several Murder Confessions Taken by Brooklyn Detective Have Similar Language*, N.Y. TIMES (June 12, 2013), http://www.nytimes.com/2013/06/13/nyregion/several-murder-confessions-taken-by-brooklyn-detective-have-similar-language.html. Washington was convicted of a 1995 murder, but he maintains that his videotaped confession is the result of coercion by NYPD detective Louis Scarcella. Washington, who had an alibi, and whom witnesses were unable to identify as the culprit at trial, contends that Scarcella fed him a script of what to say and physically abused him until he falsely confessed. Hector Lopez was convicted of a 1994 arson that left two dead, but he also maintains that Scarcella coerced a false confession from him after

hours of interrogation. The New York Times review revealed that, in those three cases and at least two others, the confessions began with the phrases "You got it right" or "I was there."

f.  Johnny Hincapie was eighteen years old when he was accused of being part of a group of teenagers who robbed a killed a tourist on a subway platform in 1990. Hincapie was convicted of robbery and second degree murder and served over twenty-five years in prison for the crime. At his trial, witnesses were unable to identify Hincapie as a perpetrator, and the chief evidence against him was a videotaped confession, which he asserts was false. Hincapie contends the confession was coerced with physical violence and intimidation. Like Sharrif Wilson, Hincapie claims he was promised that he could go home if he memorized a story about the crime that he would then tell to the prosecutor. Hincapie quickly disclaimed the confession and told his trial lawyer about how the officers had fed him information about the crime and coerced him into confessing. On October 6, 2015, Hincapie's conviction was vacated and a new trial ordered after Justice Eduardo Padro of the New York Supreme Court concluded that there was a probability that newly discovered evidence, if introduced at the original trial, would have affected the verdict. In his opinion, he noted that the new evidence raised "a real doubt as to whether the defendant was a participant in the crime."

**FEWER THAN ELEVEN MONTHS AFTER HIS EXONERATION,**

**SHARRIF WILSON PASSES AWAY AT AGE 38**

239.  At the time of his arrest, Sharrif was a promising student, the first member of his family to be admitted to one of New York City's competitive-admissions public high schools.

240.    Sharrif entered Rikers Island in June of 1992 at the age of 15. He was held first on Rikers and then in Spofford Juvenile Detention Center for almost two years pending trial.

241.    At the age of 17—when most other boys are moving into manhood, discovering who they are, completing high school, finding jobs or going to college, and learning how to properly care for themselves—Sharrif was sentenced to three, concurrent, indeterminate terms of nine years to life imprisonment.

242.    When he was arrested in June of 1992, at the age of fifteen, Sharrif was approximately 5'9" and weighed approximately 175 pounds.

243.    When he left prison in February of 2014, at the age of thirty-seven, Sharrif weighed in excess of 400 pounds.

244.    Sharrif spent twenty-two years incarcerated, unable to make decisions for himself about his day-to-day activities, his diet, and his medical care. A teenager when he entered state custody and openly gay, Sharrif lived daily, for over twenty years, with the intense stress, fear, harassment, loss of agency, and despair caused by his wrongful incarceration.

245.    As a direct result of his incarceration, Sharrif experienced severe and lifelong emotional trauma. That trauma and its effects on Sharrif's emotional and psychological development, as well as his physical well-being, denied Sharrif the ability to properly care for himself and his health. As a direct and foreseeable result of his wrongful incarceration, Sharrif was deprived of his physical health, and the natural development of his psychological and emotional ability to care for himself.

246.    After his release, Sharrif continued to struggle to cope with his trauma and its effects, as his health continued to suffer. In spite of all he had been through, after his release, Sharrif

worked hard to rebuild his life. He had plans to attend a four-year college and secure

employment as a chef, which would have allowed him to help his family financially.

247.     Although his education was interrupted by his wrongful incarceration, he had earned a

GED and a number of college credits while incarcerated.

248.     Sharrif had dreams of opening a series of restaurants, employing the skills he had learned

from his grandmother and which he hoped to supplement with further education, to contribute to

the support of his mother, two sisters, two brothers, niece, and nephew.

249.     These plans were, however, cut short. Suffering from hypertensive cardiovascular

disease, morbid obesity, sleep apnea, asthma, and congestive heart failure, Sharrif went to the

emergency room at Mount Sinai Hospital on December 30, 2014. He could not breathe and his

face was swelling. He was transferred to the medical intensive care unit for respiratory failure,

where he remained until January 10, 2015.

250.     On the night of January 10, Sharrif's heart began to fail. At 10:58 p.m., Sharrif Wilson

passed away. He was thirty-eight years old.

251.     Sharrif had been out of prison following his exoneration for less than 11 months at the

time of his death.

252.     Sharrif is survived by his mother, father, two sisters, two brothers, and a niece and

nephew.

253.     His youngest sister Tiffany Wilson was appointed the administrator of Sharrif's estate by

the Surrogate's Court of the State of New York, New York County, on May 11, 2015.

## DAMAGES

254.     The unlawful actions of the Defendant Detectives, officers, and Medical Examiner

caused Sharrif to spend almost twenty-two years—more than half of his life and the entirety of

his youth from the age of fifteen until he was thirty-seven years old—in prison for three brutal murders he did not commit.

255.    As a direct result of defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Sharrif sustained injuries and damages, including loss of his freedom for almost twenty-two years, loss of his youth, personal injuries, pain and suffering, severe mental anguish, emotional distress, and loss of his life. In addition, he also sustained further injuries and damages, including loss of income, inadequate medical care, humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

## FEDERAL CLAIMS

## COUNT I

**42 U.S.C. § 1983 Fifth and Fourteenth Amendment Claims for Violation of Sharrif's Right against Involuntary Self-Incrimination, His Right not to be Deprived of Liberty as a Result of the Fabrication of Evidence by a Government Investigator, His Right to a Fair Trial, and His Right not to be Deprived of Liberty without Due Process of Law**

256.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

257.    Defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, Venezia, Bradford, and John Doe #1, acting individually and in concert, deliberately coerced a false confession from Sharrif, fabricated inculpatory evidence against Sharrif, and withheld material exculpatory and impeachment evidence from prosecutors. Defendants thereby deprived Sharrif of his clearly established constitutional rights under the Fifth and Fourteenth Amendments of the United States Constitution, including but not limited to: his right against involuntary self-incrimination, his right not to be deprived of liberty as a result of the fabrication of evidence by a government investigator, his right to a fair trial, and his right not to be deprived of liberty without due process of law.

### A.    Coercion

258.    Defendants Grimaldi, DeCarlo, McMahon, Williams, and Izzo, acting individually and in concert, deliberately, recklessly, or intentionally coerced and compelled allegedly inculpatory statements from Sharrif Wilson and caused those coerced statements to be introduced against him in criminal proceedings, to obtain his indictment and prosecution, in violation of Sharrif's Fifth and Fourteenth Amendment rights not to be compelled to be a witness against himself, not to be deprived of liberty without due process of law, and to a fair trial.

47

259.     Defendants Grimaldi, DeCarlo, McMahon, Williams, and Izzo interrogated fifteen-year-old Sharrif Wilson in the 60th Precinct for hours on June 18, 1992. During the interrogation, Sharrif was in the defendant detectives' custody. Sharrif was taken to a small, windowless room, was questioned by three or more detectives at a time, and was not free to leave. A reasonable person, and specifically a reasonable child, in fifteen-year-old Sharrif's position would have perceived his freedom to be significantly restricted and would not have understood himself to be free to leave.

260.     Defendants Grimaldi, DeCarlo, McMahon, Williams, and Izzo employed coercive and manipulative interrogation techniques designed to overbear Sharrif's will, and ultimately coerced allegedly inculpatory statements from him.

261.     Sharrif told Defendants Grimaldi, DeCarlo, McMahon, Williams, and Izzo that he was fifteen years old. Furthermore, at fifteen, Sharrif's young age would have been objectively apparent to a reasonable officer.

262.     In 1992, New York State law and NYPD policy required detectives to treat suspects younger than sixteen years of age differently from older suspects, including by requiring them to contact a juvenile suspect's parent or guardian prior to interrogating the juvenile.

263.     Defendants Grimaldi, DeCarlo, and McMahon ignored the fact that Sharrif was fifteen years old and did not call a parent or a guardian for Sharrif. Instead, they later falsely reported both orally and in their written reports that Sharrif told them he was 17 years old and that his date of birth was August 18, 1974, instead of August 18, 1976.

264.     The defendants knew that Sharrif was exhausted, having not slept at all the previous night. He was so tired that he nodded off repeatedly as the defendant detectives questioned him. Instead of allowing Sharrif to sleep, the detectives kept questioning him.

265.     Each time Sharrif fell asleep, Defendant DeCarlo would slap him in the head to awaken him, and again demand he confess. At other times, Defendant DeCarlo followed demands that Sharrif confess with additional slaps to Sharrif's head.

266.     Three to four detectives, including Defendants Grimaldi and DeCarlo, interrogated Sharrif at a time. DeCarlo repeatedly slapped Sharrif on his head, and his interrogators repeatedly slammed their hands on the table. The detectives demanded that Sharrif tell them that he and Tony Yarbough had strangled and stabbed the victims and then moved their bodies.

267.     The interview room was small, and the three detectives were big. As the questioning continued Sharrif grew more and more afraid.

268.     Defendants Grimaldi, DeCarlo, and McMahon, acting individually and in concert, overbore Sharrif's will and coerced him into falsely confessing to the Yarbough, Barnes, and Knox murders. They did so by, for example, keeping a fifteen-year-old Sharrif in a small, windowless room for hours without a parent or a guardian present, relentlessly questioning and accusing him, feeding him nonpublic facts about the crimes, refusing to let him sleep, repeatedly hitting him on his head, making him feel threatened and afraid, and falsely promising him that if he just told them what they wanted to hear he could go home.

269.     Because of defendants' coercion, physical abuse, and manipulation, Sharrif's will was overborne such that the "confession" was not the product of his free will and rational intellect.

270.     The end result of the coercive interrogation, the oral and videotaped "confession," was used against Sharrif before the grand jury, during pretrial hearings, and at trial. It was the centerpiece of the prosecution.

271.     The defendant officers performed the above-described acts under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Sharrif's

constitutional rights and innocence. No reasonable officer in 1992 would have believed this conduct was lawful.

272.    As a direct and proximate result of defendants' actions, Sharrif was indicted, tried, wrongly convicted and imprisoned for almost twenty-two years and suffered the other grievous damages and injuries set forth above.

### B.    Fabrication of Evidence

273.    Defendants Grimaldi, DeCarlo, McMahon, Luongo, Williams, Izzo, Venezia, Bradford, and John Doe #1 deliberately fabricated inculpatory evidence against Sharrif, including by fabricating Sharrif's "confession", fabricating Tony's written "confession," and fabricating inculpatory details about Sharrif and Tony's conduct on the morning of June 18, 1992, thereby depriving Sharrif of his Fourteenth Amendment right not to be deprived of liberty as a result of the fabrication of evidence by a government investigator, not to be deprived of liberty without due process of law, and to a fair trial. These fabrications were each used against Sharrif to cause his convictions.

274.    Specifically, defendants Grimaldi, DeCarlo, and McMahon fabricated and coerced a false confession from Sharrif in which they fed Sharrif nonpublic facts about the crimes that had been held back from the public. For example, Grimaldi, DeCarlo, and McMahon fed Sharrif the facts that:

    a.    Annie Yarbough, Chavonne Barnes, and Latasha Knox had been stabbed numerous times in their chests and had been strangled;

    b.    Both of the twelve-year-old victims had their breasts exposed, but their underwear on, while Annie Yarbough was fully clothed;

    c.    All three victims had clothing tied around their hands and feet;

  d.      Electrical cords had been cut from the electrical appliances in the house, including

a radio and a fan; and

  e.      Lengths of electrical cord, which appeared to have been cut from those electrical

appliances in the house, were tied around each victim's neck.

Then, Grimaldi, Decarlo, and McMahon misrepresented in police reports, pretrial

communications with prosecutors, and testimony that Sharrif spontaneously and voluntarily

confessed and that the incriminating details in his confession originated with Sharrif, in order to

make his confession appear reliable, when in fact they knew it was not.

275.    In addition to feeding Sharrif this nonpublic information about the crimes and coercing

him into adopting it in his "confession," the interrogating detectives also fabricated and fed

Sharrif a *false* nonpublic fact: that the murder weapon was a steak knife, which was consistent

with the knives Detective Feit and Sergeant Murnane reported recovering from the crime scene.

This was a false fact. The steak knives, which later tested negative for any trace of blood or

tissue, were not the murder weapons.

276.    In addition to feeding Sharrif this nonpublic information and coercing him into adopting

it in his "confession," the interrogating detectives also fabricated and fed Sharrif their theory of

Sharrif and Tony's motive for committing the crimes: that Sharrif and Tony were both gay and

that Tony's mother had disapproved of Sharrif being in her home. This was false. Sharrif and

Tony were not and had not been in a romantic relationship, and Tony's mother had been

accepting of her son's identity.

277.    In addition to feeding Sharrif this nonpublic information and coercing him into adopting

it in his "confession," Defendants Grimaldi, DeCarlo, and McMahon fabricated and falsely

reported both orally and in their written reports that Sharrif had told them that he was 17 years

old, and that his date of birth was August 18, 1974, instead of August 18, 1976. In fact, Sharrif had told detectives the truth: that he was 15 years old, and that his date of birth was August 18, 1976.

278.    Defendants Grimaldi, DeCarlo, and McMahon also fabricated and coerced Tony's signature on a separate false, written confession. The defendant detectives fabricated the written confession to include their false theory of the crimes, as well as non-public facts about the crimes that had been held back from the public, including that a radio electric cord had been used to tie up one of the victims.

279.    In addition, though Sharrif and Tony's initial independent accounts of their whereabouts the previous evening, night, and early morning were consistent, innocent, and truthful, Detectives Williams and Izzo fabricated discrepancies among Sharrif and Tony's accounts and that of another witness Ron Carrington. Williams and Izzo misrepresented in police reports, pretrial communications with prosecutors, and testimony that these inconsistent details spontaneously originated with Tony, Sharrif, and Mr. Carrington, in order to make Tony and Sharrif appear suspicious, when in fact they knew their accounts had been consistent.

280.    Defendants Venezia and Bradford, the first responding officers at the Yarbough apartment, fabricated details about Tony's conduct, mannerisms, and affect after discovering his mother, sister, and sister's best friend's dead and brutalized bodies. Bradford misrepresented in police reports, pretrial communications with prosecutors, and testimony that Tony was mild-mannered, calm, and had a flat demeanor and that he was not crying shortly after he had discovered his mother, sister, and sister's best friend's bodies, when in fact Tony was visibly upset and crying.

281.    Furthermore, Defendant Medical Examiner Arden, who conducted the autopsies on the three murder victims, fabricated and misrepresented in reports, pretrial communications with prosecutors, and testimony that, based on the medical evidence, the murders could have taken place after 6:30 a.m., when in fact Arden knew this conclusion was medically excluded.

282.    The defendant officers and medical examiner performed the above-described acts under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Sharrif's constitutional rights and innocence. No reasonable officer or medical examiner in 1992 would have believed this conduct was lawful.

283.    As a direct and proximate result of defendants' actions, Sharrif was indicted, tried, wrongly convicted and imprisoned for almost twenty-two years and suffered the other grievous damages and injuries set forth above.

### *C.     Failure to Disclose Exculpatory and Impeachment Evidence to the Prosecution*

284.    Defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, John Doe #1, and Luongo suppressed material exculpatory and impeachment information from the prosecution and defense, including without limitation the facts that the interrogating defendants fed both Sharrif and Tony nonpublic details about the crime and misreported that those incriminating facts originated with each of them and that the interrogating defendants coerced a false confession from both Sharrif and Tony, by use of physical and verbal threats, false promises, and/or homophobic and racial slurs.

285.    Defendant Medical Examiner Arden also suppressed material exculpatory and impeachment information from the prosecution and defense, including without limitation the fact that the condition of the bodies at the time they were found medically indicated that the murders

had occurred prior to 4:30 a.m. on June 18, 1992—a time period for which Sharrif and Tony had confirmed alibis.

286.     The defendant officers and medical examiner performed the above-described acts under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Sharrif's constitutional rights and innocence. No reasonable officer or medical examiner in 1992 would have believed this conduct was lawful.

287.     As a direct and proximate result of defendants' actions Sharrif was indicted, tried, wrongly convicted and imprisoned for almost twenty-two years and suffered the other grievous damages and injuries set forth above.

## COUNT II

### 42 U.S.C. § 1983 Fourth and Fourteenth Amendment Claim for Malicious Prosecution

288.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

289.     Defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, Feit, Bradford, Venezia, John Doe #1, and Luongo, with malice and knowing that probable cause did not exist to arrest Sharrif and prosecute him for the murders of Annie Yarbough, Chavonne Barnes, and Latasha Knox, acting individually and in concert, caused Sharrif to be arrested, charged, and prosecuted for that crime, thereby violating Sharrif's clearly established right, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free of unreasonable searches and seizures.

290.     Specifically, defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, and Luongo, with malice, knew or in the absence of their deliberate and reckless indifference to the truth should have known that probable cause did not exist to arrest and prosecute Sharrif, including but not limited to the facts that Sharrif's allegedly inculpatory statements were not the product of his free

54

will and rational intellect, that allegedly inculpatory evidence had been fabricated by the defendants, and that those factors as well as additional material exculpatory and impeachment evidence which defendants did not disclose to the grand jury or prosecutors undermined the evidence presented in support of a probable cause finding against Sharrif.

291.    In addition, the defendant officers, with malice, acting individually and in concert, intentionally and knowingly, deliberately misrepresented the truth and withheld exculpatory facts from prosecutors and the grand jury that vitiated probable cause against Sharrif, including but not limited to their having fed Sharrif nonpublic facts about the crimes he did not and could not have known, and their having manipulated and coerced him into adopting those facts in the so-called "confession."

292.    The defendant officers performed the above-described acts under color of state law, deliberately, intentionally, or with reckless disregard for the truth and Sharrif's rights, and with malice.

293.    Defendants initiated and continued the prosecution against Sharrif without probable cause, in violation of Sharrif's clearly established constitutional rights. No reasonable officer in 1992 would have believed this conduct was lawful.

294.    Sharrif Wilson is innocent of the Yarbough, Barnes, and Knox murders.

295.    The prosecution finally terminated in Sharrif's favor on February 6, 2014, when his conviction was vacated and the indictment against him dismissed.

296.    As a direct and proximate result of defendants' conduct, Sharrif was maliciously prosecuted, wrongly convicted and imprisoned for almost twenty-two years and suffered the other grievous damages and injuries set forth above.

55

## Count III

### 42 U.S.C. § 1983 Fourth and Fourteenth Amendment Claim for Failure to Investigate Available Exculpatory Evidence, under *Russo v. City of Bridgeport*

297.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

298.    Defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, Feit, Bradford, Venezia, Luongo, and the John and Jane Doe officers and supervisors, acting individually and in concert, ignored the facts in front of them and failed to investigate evidence that they knew, or in the absence of their deliberate and reckless indifference should have known, vitiated probable cause for Sharrif's prosecution.

299.    The deliberate and reckless investigative failures of the defendants included, but were not limited to: failing to identify and investigate the men who were in Annie Yarbough's apartment using drugs and arguing the night of the crime, including failing to investigate the man who threatened Annie Yarbough with a knife that night and with whom Ms. Yarbough and the two girls were last seen alive; failing to identify and investigate any of the people with whom Ms. Yarbough attended the Coney Island Hospital's methadone clinic, including those whom witnesses identified as being present at Ms. Yarbough's apartment the night of the murders; and failing to investigate exculpatory and potentially exculpatory medical and forensic evidence, including but not limited to serology, hair, fingerprint, and DNA evidence.

300.    Sharrif Wilson is completely innocent of the Yarbough, Barnes, and Knox murders.

301.    Despite his innocence and the absence of probable cause to prosecute him, Sharrif was held from his arrest on June 18, 1992 until the prosecution against him finally terminated in his favor on February 6, 2014, when his conviction was vacated and the indictment against him dismissed.

302.    The defendant detectives, officers, and supervisors' deliberate and reckless failure to investigate deprived Sharrif of his clearly established constitutional rights under the Fourth and Fourteenth Amendments of the United States Constitution, including but not limited to his right not be subject to unreasonable seizures.

303.    The defendant officers performed the above-described acts under color of state law, deliberately, recklessly, with malice, and with deliberate indifference or reckless disregard for Sharrif's constitutional rights and innocence. No reasonable officer in 1992 would have believed this conduct was lawful.

304.    As a direct and proximate result of defendants' conduct, Sharrif was maliciously prosecuted, wrongly convicted and imprisoned for almost twenty-two years and suffered the other grievous damages and injuries set forth above.

### COUNT IV

### 42  U.S.C. § 1983 Civil Rights Conspiracy

305.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

306.    Defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, Feit, Bradford, Venezia, John Doe #1, and Luongo, acting within the scope of their employment and under color of state law, agreed among themselves and with others to act in concert in order to deprive Sharrif of his clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, malicious prosecution, coercion, deprivation of liberty without due process of law, and to a fair trial, as well as depriving him of his First and Fourteenth Amendment rights of access to courts and executive clemency.

307.    In furtherance of the conspiracy each defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

a.      Defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, Venezia, Bradford, and John Doe #1 deliberately fabricated inculpatory evidence, including without limitation the claim that the nonpublic facts in the confession originated with Sharrif; falsified reports and other accounts of their investigative activities and the interrogations of Sharrif and Tony; and failed to document and disclose material exculpatory evidence to prosecutors;

b.      Defendants Grimaldi, DeCarlo, and McMahon overbore Sharrif's will and coerced him into falsely confessing to the Yarbough, Barnes, and Knox murders by illegally taking advantage of his young age, his inexperience, and his exhaustion; falsely telling him that he could go home if he just told them what they wanted to hear; DeCarlo repeatedly hitting him on his head; and Grimaldi, DeCarlo, and McMahon feeding him nonpublic facts about the crimes;

c.      Defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, Feit, and Luongo failed to properly investigate the drug-using stranger who was in Annie Yarbough's apartment when she and the girls were last seen alive and who had threatened Annie Yarbough with a knife in her apartment on the night she was killed;

d.      Defendants Grimaldi, Williams, McMahon, Luongo, and Bradford deliberately provided perjured testimony in the grand jury, pretrial hearings, and/or in Sharrif's criminal trial, consistent with their out-of-court misrepresentations in documents and other official communications.

308.    As a direct and proximate result of defendants' actions Sharrif was wrongly convicted and imprisoned for almost twenty-two years and suffered the other grievous damages and injuries set forth above.

## COUNT V

### 42 U.S.C. §1985(3) Conspiracy

309.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

310.    Defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, Feit, Bradford, Venezia, and Luongo, and others yet unknown, violated Sharrif's clearly established rights under 42 U.S.C. § 1985(3), when, motivated by racial and sexual-orientation-based animus—as evidenced in part by their use of homophobic and racial slurs during their coercive interrogation of Tony and by the homophobia evident in their fabricated and baseless theory of a crime motivated by Tony and Sharrif's homosexuality—Defendants agreed among themselves to act in concert to deprive Sharrif of the equal protection of the laws.

311.    In furtherance of the conspiracy each defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

        a.    Defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, and Luongo
              deliberately fabricated inculpatory evidence, including without limitation the
              claim that the nonpublic facts in the confession originated with Sharrif and the
              false narrative that Sharrif and Tony's motivation for the murders was Sharrif and
              Tony's sexual orientation and supposed conflict with Tony's mother over his
              sexuality; falsified reports and other accounts of their investigative activities and
              the interrogations of Sharrif and Tony; and failed to document and disclose

material exculpatory evidence to prosecutors;

b.   Defendants Grimaldi, DeCarlo, and McMahon overbore Sharrif's will and coerced him into falsely confessing to the Yarbough, Barnes, and Knox murders by illegally taking advantage of his young age, his inexperience, and his exhaustion; falsely telling him that he could go home if he just told them what they wanted to hear; slapping their hands on the interview table to keep Sharrif awake; DeCarlo repeatedly hitting him on his head; Grimaldi, DeCarlo, and McMahon feeding him their fabricated motive for the crime based on Sharrif and Tony's sexuality; and feeding him nonpublic facts about the murders that had been withheld from the public; and

c.   Defendants Grimaldi, DeCarlo, and McMahon overbore Tony's will and coerced him into signing a false confession to the Yarbough, Barnes, and Knox murders by fabricating a written confession for Tony's signature that included the false narrative of Tony and Sharrif's sexuality-driven motive for the murders; barraging Tony with homophobic and racial slurs and threats of violence; threatening him with a service revolver; and taking advantage of his youth, his inexperience, and his grief.

312.   As a direct and proximate result of defendants' actions Sharrif was wrongly convicted and imprisoned for almost twenty-two years and suffered the other grievous damages and injuries set forth above.

## COUNT VI

### 42 U.S.C. § 1983 Failure to Intercede

313.   By their conduct and under color of law, the defendant officers and supervisors had opportunities to intercede on behalf of Sharrif to prevent the violation of Sharrif's right against

involuntary self-incrimination, his malicious prosecution, and the deprivation of his liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so. The defendant officers and supervisors' failures to intercede violated Sharrif's clearly established constitutional rights, including but not limited to his right against involuntary self-incrimination and not to be deprived of liberty without due process of law as guaranteed by the Fifth and Fourteenth Amendments.

314.    The defendant officers performed the above-described acts under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Sharrif's constitutional rights and innocence. No reasonable officer in 1992 would have believed this conduct was lawful.

315.    As a direct and proximate result of defendants' actions Sharrif was indicted, tried, wrongly convicted and imprisoned for almost twenty-two years and suffered the other grievous damages and injuries set forth above.

<u>COUNT VII</u>

**42 U.S.C. § 1983 Supervisory Liability**

316.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

317.    Defendant Luongo, and John and Jane Doe Supervisors, acting within the scope of their employment and under color of state law, were personally involved in the case against Sharrif, and Luongo admitted that he personally observed and supervised Sharrif's interrogation. Defendant Luongo, and John and Jane Doe Supervisors, knew, or in the absence of their deliberate indifference, recklessness, and gross negligence should have known, that their subordinate officers had deprived Sharrif of his clearly established constitutional rights through

misconduct that included but was not limited to coercing and fabricating a "confession" from Sharrif; ignoring Sharrif's youth and continuing to interrogate him without a parent or guardian present; deliberately ignoring evidence of Sharrif's innocence; failing to properly investigate the drug-using stranger who was in Annie Yarbough's apartment when she and the girls were last seen alive and who had threatened Annie Yarbough with a knife in her apartment on the night she was killed; and violating Defendants' ongoing affirmative obligation to come forward with the evidence of innocence and the truth of their own misconduct.

318.    Defendant Luongo and the John and Jane Doe supervisory Defendants, by deliberately and/or recklessly failing to supervise their subordinate officers, and by their active and direct participation in and facilitation of their subordinates' misconduct, caused their subordinates to deprive Sharrif of his clearly established constitutional rights, including but not limited to his right not to be compelled to be a witness against himself, to be free from unreasonable searches and seizures, not to be deprived of liberty without due process of law, and to have access to the courts and executive clemency.

319.    Moreover, Luongo and the John and Jane Doe supervisory Defendants allowed their subordinates to act with impunity in an environment in which those subordinates were not supervised, disciplined, or trained, and in which those subordinates knew that their violations of Sharrif's constitutional rights would be facilitated, approved, and/or condoned by Luongo and the supervisory Defendants.

320.    Defendant Luongo and the John and Jane Doe supervisory Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer in 1992 would have believed that the supervisory Defendants' actions were lawful.

321.    As a direct and proximate result of Defendant Luongo and the John and Jane Doe supervisory Defendants' actions, Sharrif was wrongly prosecuted, convicted, and imprisoned for almost twenty-two years and suffered the other grievous injuries and damages as set forth above.

## COUNT VIII

### 42 U.S.C. § 1983 *Monell* Claim for Unconstitutional Custom or Policy

322.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

323.    The City of New York, by and through its final policymakers, had in force and effect during the Yarbough, Barnes, and Knox murder investigation and for years beforehand, a policy, practice or custom of unconstitutional misconduct in homicide investigations, including in particular the use of coercive techniques in interviews and interrogations to obtain confessions; the fabrication of inculpatory evidence; and the fabrication of incriminating statements from witnesses, suspects, and arrestees by feeding nonpublic facts about the crime that only the police and the true perpetrator would know to those witnesses, suspects, and arrestees.

324.    Final policymakers for the City of New York had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations to obtain confessions; fabricating inculpatory evidence, and, particularly, fabricating incriminating statements from witnesses, suspects, and arrestees by feeding non-public facts about the crime that only the police and the true perpetrator would know to those witnesses, suspects, and arrestees. The continued adherence to these unconstitutional municipal customs, practices and/or policies amounted to deliberate indifference to the constitutional rights of criminal defendants like Sharrif.

Such unconstitutional municipal customs, practices and/or policies were the moving force behind
Sharrif's false, coerced and fabricated confession, causing his arrest, prosecution, and almost
twenty-two years of incarceration, as well as all the other grievous injuries and damages set forth
above.

## STATE LAW CLAIMS

## COUNT IX

### Malicious Prosecution

325.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further
alleges as follows:

326.    Defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, Feit, Bradford, Venezia, John
Doe #1, and Luongo, with malice and despite knowing that probable cause did not exist to arrest
and prosecute Sharrif for the murders of Annie Yarbough, Chavonne Barnes, and Latasha Knox,
acting individually and in concert, caused Sharrif to be arrested, charged, prosecuted, and
convicted for the Yarbough, Barnes, and Knox murders. Specifically, they intentionally and
knowingly deliberately misrepresented the truth and withheld exculpatory facts from prosecutors
and the grand jury that vitiated probable cause against Sharrif, including but not limited to the
fact that they fed Sharrif nonpublic facts about the crime he did not and could not have known,
and that they manipulated and coerced him into adopting those facts in the so-called
"confession."

327.    Sharrif Wilson is innocent of the Yarbough, Barnes, and Knox murders. Sharrif's cause of
action for malicious prosecution was unavailable to him until his prosecution finally terminated
in his favor on February 6, 2014, when his conviction was vacated and the charges against him
were dismissed.

328.    Defendants engaged in these acts within the scope of their employment.

329.    As a direct and proximate result of defendants' actions, Sharrif was wrongly convicted and imprisoned for almost twenty-two years and suffered the other grievous damages and injuries set forth above.

## COUNT X

### State Law Wrongful Death Claim (EPTL § 5-4.1 *et seq.*)

330.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

331.    Sharrif Wilson passed away on January 10, 2015, at Mount Sinai Hospital in New York, New York.

332.    When Defendants first wrongfully arrested Sharrif, he was a healthy fifteen-year-old, who weighed approximately 175 pounds. When he was finally freed almost twenty-two years later, Sharrif weighed in excess of 400 pounds and suffered from a number of prison-induced health problems that lead to his death at the age of 38, less than a year after being released. The 1976 life expectancy at birth for non-white males in the U.S. was 64.1 years, 26 years longer than Sharrif lived.

333.    Defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, Venezia, Bradford, John Doe #1, and Luongo's wrongful and neglectful acts, including, *inter alia*, coercion, fabrication of evidence, and failure to disclose exculpatory evidence to the prosecution, foreseeably caused Sharrif's untimely death by leading predictably to his wrongful conviction and incarceration in an environment known to reduce life expectancy and impair health. In violating his rights, Defendants knowingly ensured that Sharrif would spend years in a violent and traumatizing environment, especially for a gay teenager in the early 1990s.

334.     As a direct result of his incarceration, Sharrif experienced severe and lifelong emotional

trauma. That trauma and its effects on Sharrif's emotional and psychological development, as

well as his physical well-being, denied Sharrif the ability to properly care for himself and his

health. As a direct and foreseeable result of his wrongful incarceration, Sharrif was deprived of

his physical health, and the natural development of his psychological and emotional ability to

care for himself.

335.     In 1992, Sharrif was a healthy fifteen-year-old with a normal body weight for his height.

By the time Sharrif was freed from prison, he suffered from a variety of medical problems, and

was morbidly obese., having developed the severe respiratory and cardiovascular issues that

resulted in his untimely death.

336.     Sharrif is survived by distributees who suffered pecuniary loss by reason of his death: his

sisters, Tiffany Wilson and Fatima Wilson, his brothers, Barry Wilson and Eric Wilson, his

father, Henry Johnson, and his mother, Gloria Wilson. At the time of his arrest, Sharrif was a

promising student, the first member of his family to be admitted to one of New York City's

prestigious competitive-admissions public high schools. Even after his exoneration and release

from prison, Sharrif planned to attend a four-year college and secure employment as a chef,

which would have allowed him to help his family financially. Although his education was

interrupted by his wrongful incarceration, he had earned a GED and a number of college credits

while incarcerated.

337.     Sharrif's family lost not only his future financial support, but the voluntary assistance that

he would have provided his family, as a loving son, brother, and uncle: Sharrif's parents' are both

over the age of 60, and he had a young niece and a nephew. Most of his family resides in the

New York City area, where he also lived until his untimely death. Before his incarceration,

Sharrif's grandmother had taught him to cook. After Sharrif's time in prison prevented him—for most of his life—from providing meals and child care to his family members, his untimely death prevented him from providing those services to his parents, siblings, and nephew and niece over the course of the rest of a normal life span.

338.    This claim is brought by Sharrif's Personal Representative: Sharrif's sister, Tiffany Wilson, was appointed the Administrator of his Estate by the Surrogate's Court of the State of New York, New York County, on May 11, 2015.

### COUNT XI

**Intentional, Reckless or Negligent Infliction of Emotional Distress**

339.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

340.    The improper, deliberate, and traumatizing conduct of defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, and Luongo, during the interrogation of Sharrif, as well as their conduct in deliberately causing, or recklessly disregarding the risk of causing, the wrongful prosecution, conviction, incarceration, and concomitant severe emotional distress, was extreme and outrageous, and directly and proximately caused the grievous injuries and damages set forth above.

341.    In the alternative, defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, Feit, Bradford, Venezia, and Luongo, negligently and grossly negligently, and in breach of their duties owed to Sharrif to, *inter alia*, report accurately the information given to him and his own statements and the circumstances underlying such statements; report accurately the information taken from other witnesses and their investigative responses to such information; and refrain from fabricating evidence, coercing and manipulating Sharrif, withholding material exculpatory

and impeachment evidence, and otherwise acting to deny Sharrif due process of law, directly and proximately caused Sharrif, an innocent teenager, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned for more than two decades. Defendants' actions unreasonably endangered Sharrif's physical health and safety, and caused him to suffer physical harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and post-conviction incarceration.

342.   Defendants engaged in these acts within the scope of their employment.

343.   These claims are tolled as defendants concealed from Sharrif – and still are concealing to this day—their conduct giving rise to this cause of action.

## COUNT XII

### Negligence

344.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

345.    Defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, Feit, Bradford, Venezia, and Luongo are liable for negligence, having breached their duty of reasonable care to Sharrif, an innocent teenager.

346.   Specifically, and by way of example, defendants:

a.      failed to ensure that they did not contaminate Sharrif's confession by providing him with nonpublic facts about the murder;

b.      failed to report accurately the circumstances of the interrogation, including information they provided to Sharrif and information originating with Sharrif; and

c.      failed to properly investigate the drug-using stranger who was in Annie

Yarbough's apartment when she and the girls were last seen alive and who had threatened Annie Yarbough with a knife in her apartment on the night she was killed.

347.    Defendant Arden is liable for negligence, having breached his duty of reasonable care to Sharrif, an innocent teenager.

348.    Specifically, and by way of example, Dr. Arden:

a.    failed to investigate or failed to document investigation of basic pertinent information regarding time of death, including what the credible evidence indicated about when the three victims had last been seen alive;

b.    failed to report that based on the condition of the bodies at the time they were found, his autopsy findings, and other information available to him, he was aware that the medical evidence demonstrated that the murders had occurred prior to 4:30 a.m. on June 18, 1992, in contradiction to Sharrif and Antonio's confessions and when they both had independently corroborated alibis; and

c.    failed to include any opinion about time of death in his autopsy reports for Ms. Yarbough, Ms. Barnes, and Ms. Knox.

349.    Defendants' negligence and gross negligence directly and proximately caused Sharrif, an innocent teenager, to be wrongly prosecuted and imprisoned for more than two decades.

350.    Defendants engaged in these acts within the scope of their employment.

351.    Sharrif Wilson is innocent of the Yarbough, Barnes, and Knox murders. Sharrif's cause of action for negligence was unavailable to him until his prosecution finally terminated in his favor on February 6, 2014, when his conviction was vacated and the charges against him were dismissed. Furthermore, this claim is tolled as defendants concealed from Sharrif—and still are concealing to this day--their conduct giving rise to this cause of action.

## COUNT XIII

### *Respondeat Superior* Claim Against the City of New York

352.     Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

353.     At all times relevant to this Complaint, defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, Feit, Bradford, Venezia, and Luongo acted as agents of the City of New York, in furtherance of the business, including law enforcement functions, of the City of New York, and within the scope of their employment or agency with City of New York.

354.     The conduct by which the defendant officers committed the torts of malicious prosecution, intentional, reckless or negligent infliction of emotional distress, and negligence was not undertaken for the defendant officers' personal motives, but rather was undertaken while the defendant officers were on duty, carrying out their routine investigative functions as detectives and police officers.

355.      Under the doctrine of *respondeat superior*, the City of New York is liable for their agents' state law torts of malicious prosecution, wrongful death, intentional, reckless or negligent infliction of emotional distress, and negligence.

     **WHEREFORE**, Tiffany Wilson, as administrator of the Estate of Abdul Sharrif Wilson, prays as follows:

   A.     That the Court award compensatory damages to plaintiff and against the defendants, jointly and severally, in an amount to be determined at trial;

   B.     That the Court award punitive damages to plaintiff, and against all individual defendants, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

C.      For a trial by jury;

D.      For pre-judgment and post-judgment interest and recovery of the Estate's costs,

        including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42

        U.S.C. § 1983 claims; and

E.      For any and all other relief to which the Estate may be entitled.


Dated:      New York, New York
            July 15, 2015                        /s/ Nick Brustin
                                                 Nick Brustin
                                                 Emma Freudenberger
                                                 NEUFELD SCHECK & BRUSTIN, LLP
                                                 99 Hudson Street, 8th Floor
                                                 New York, New York 10013
                                                 (212) 965-9081

                                                 /s/ Adam D. Perlmutter
                                                 Adam D. Perlmutter
                                                 Daniel McGuinness
                                                 PERLMUTTER & MCGUINNESS, P.C.
                                                 260 Madison Avenue, Suite 1800
                                                 New York, NY 10016
                                                 (212) 679-1990

                                                 **Attorneys for Plaintiff Estate of Sharrif Wilson**